Next case is United States of America versus Jerry Fruit. Consolidated with the United States of America versus a K Garner. Mr. Donahue. Good morning, your honors. And may it please the court. I will reserve two minutes of my time for rebuttal. If I may grant it. Your honors, this case raises an issue of the scope of police authority in traffic stops after the important Supreme Court decision in Rodriguez v. United States. There, the court held that a traffic stop may not be extended beyond the time necessary to address the violation for which it was made. In other words, officers may not add time to the stop by diverting from its traffic-based mission in order to question a vehicle's occupants or conduct other investigation intended to gin up suspicion of some other crime. And the rule of Rodriguez eliminated what had been a very perverse incentive for officers to take the opportunity of any traffic stop to indulge any sort of In this case, it's clear that the Pennsylvania state police trooper followed a practice that had been developed to take advantage of precisely that incentive. And knowing virtually nothing more than that two black men were traveling from New York to Maryland in an air freshened rental car. He pulled them over for speeding, but rather than address himself to that violation, diverted from the mission of the stop to conduct lengthy interviews, asking dozens of questions entirely unrelated to the observed violation. When was the moment that he diverted? When's the Rodriguez moment? We would put the Rodriguez moment at 854 and 33 seconds. That is when. And that's on the dash cam video, not from time of stop. That's the count at the top of the dash cam. So it actually reads 20, 54, 33. Describe why that's the Rodriguez moment. The question that the trooper asked at that moment was, you're going to visit a cousin. What's your cousin's name? Now, this was a confrontational question. Obviously, it's entirely irrelevant to the traffic stop what his cousin's name is. But because Mr. Fruit had said he was traveling to Maryland to visit a cousin, the officer who's trying to develop discrepancies in these men's accounts to turn up something to support a hunch confronts him with that question. Now, to me, that's that's quite marked. I wouldn't expect if I were pulled over and I'm asked where I'm going, I'm saying I'm going to visit a relative to then be told, oh, yeah, you're visiting. What's your relative's name? And I think that it's that. By that point, did the officer had the officer already seen the four air fresheners? Yes. At that point, had the officer already known? Did the officer already know it was a rental car? Yes. By that point, did the officer already know that the rental contract was expired? He had not yet questioned Mr. Fruit about the details of that. So he looked at the rental contract. I don't know when he noticed that detail. The rental contract said right on it when it expired. It expired a few weeks prior to the traffic stop, right? Right. Why if the officers see the air fresheners in a rental car that's being driven a couple weeks after the contract has expired and doesn't have the normal rental barcodes on it, Why doesn't that bundle of facts give the officer enough reasonable, articulable suspicion to engage in the traffic stop equivalent of a Terry stop? Because even taken in their totality, all those facts are simply too innocuous, too slender a read for this court to come to a conclusion that there was an objective, particularized basis. So we know at least that the test, as I understand it, summarizes reasonable, articulable suspicion. So at a minimum, we know that there's an articulable suspicion. The officers could have probably articulated the suspicion of drug trafficking or something else, maybe stolen vehicle, I don't know, but some suspicion at an earlier point in time. And it sounds to me that what your pushback is, is no, it's not just the ability to articulate a suspicion, that articulation of suspicion must also be reasonable. And so it seems to me that what you're saying is these facts, although maybe sufficient to articulate a suspicion, aren't a reasonable enough grounds for that suspicion to be within the bounds permitted by the Constitution. I think that's a fair way of putting it. Judge Posner makes the point in a case we cited in our reply brief that whether you stand up or sit down, go above, below, or at the speed limit, if the police want to stop you, they'll describe your behavior as suspicious. So a trooper can rattle off facts, but it remains for this court, or the court in which a Fourth Amendment challenge is ultimately raised, to say whether they're reasonable. So I guess, sorry to interrupt, but just to tease this out, if those facts, as my colleague Judge Hardiman articulated, if those as a matter of law are reasonable, then this question about the identity, the name of the cousin, would be permitted under the Constitution pursuant to a terrorist act, if, the big if, is if that suspicion was reasonable. Am I following? Is that a necessary consequence? I think we haven't challenged that consequence on this field. Okay. Reasonable suspicion can be extended. Okay. Why aren't the constellation of facts that Judge Hardiman described reasonable? Well, they're simply too common. These facts are too common. And I would point out that the trooper himself, for example, with regard to the barcode stickers, he disclaimed in a portion of his testimony that those gave him reasonable suspicion. That's at page 127 of the appendix. So even when you put the other... Well, it's part on its own. Right. That's not enough alone. Yes. He also thought four air freshers at a rental car was unusual, if not unprecedented, right? Yes, and the rationale... That's sort of the weird thing about rental cars. They smell better than everybody else's cars. Right. They're new. They don't have much mile on them. Right. The more specific point he made about rental cars, at one point he mentioned new car smell. But what he said more articulately was that people only have a rental car for a day or two, so they don't go out and buy air fresheners. That's how they're sold, by the way, in these four packs of clips. He didn't say that was extraordinary. They don't equip a rental car if they're only having it for a couple of days. But what he learned early on in this stop, as your Honor alluded to earlier, was that my client had actually had this car for nearly a month. So his reason for believing air fresheners were so suspect was then cast aside. Right, but having a car for a month well beyond the contract, that raises a whole new important suspicion, i.e., is this now a stolen car? This was a lawfully possessed car. Now is it a car that the rental company has probably been looking for for a couple of weeks? I would say both as a matter of law and on the facts of this case, that's a mistaken approach. So to look at the law, there was a notable decision in 2018 in Byrd v. United States, a Supreme Court decision, about whether an unauthorized driver had a reasonable expectation of privacy in a rental car. And while that is a distinct question from the one here, the Court made quite clear that really all that matters as far as an expectation of privacy is that the person be an authorized bailee. Certainly he knew that here. But you can have an authorized expectation of privacy in a car and be driving a car illegally at the same time, right? Yes, but... Even someone who steals a car may have an authorized... Isn't that kind of the point of Byrd? As I read Byrd, it was, if you're driving a car, you have an expectation of privacy in it. Unless you're a car thief. I guess the thief wouldn't. But any other bailee or otherwise authorized driver... Yes, but I think the Supreme Court does draw the line at a car thief. Now here, by this point, before the trooper even approached the window, he confirmed that the car had not been reported stolen. He had that information. That's at page 110 of the appendix. So when he sees my client's name on the rental agreement, my client is the authorized renter, car hasn't been reported stolen, that should actually be the end of the matter. We're not resting our case on the notion that he couldn't have done some follow-up questioning about the rental agreement. But if it were material, that would be my position. Now it's not material because it's not just... While the Rodriguez moment came at 8.54.33, there followed seven and a half minutes of questioning. If any portion of that questioning is off mission and there was not reasonable suspicion, then it unlawfully extended the stop under this court's decisions in Clark and Green. So he did still have to confirm that, okay, this rental agreement had been extended. And if you watch the video, you'll see that everybody who ever discusses the rental agreement describes it as, oh, everyone always extends rental agreements, including the trooper, his own words. I thought that delayed the stop sufficiently. Maybe we can ask Mr. Yananek about this. But it just seemed that once he learned that the car was off rental agreement and he tried to get in touch with, I think, was it National? Enterprise. That seemed to take a while, didn't it? Well, he'd already gotten a coherent account from my client of why the date had passed. Well, he doesn't have to believe that. You'd expect him to go verify that with the bailor, right? Which he did much later, and he did verify. But my point is simply that my client's account was not suspect. He offered an account, still legitimate, if we say it's legitimate to be inquiring into rental agreements, for the trooper to check that out. But I'll just point the court, in conclusion of my initial argument, to two periods of 45 seconds during that seven and a half minute period when the trooper asked my client and the passenger about their employment and their relationship with one another. And the specific interval is noted in our reply brief there. And then there was another 30 seconds where the trooper asked my client and the passenger a series of questions about whether they had contraband or drugs in the car. So that could not but be more clearly. But, I mean, at one level, are you basically saying that Rodriguez creates almost like a zero tolerance for officers who ask any question off mission? If an officer pulls a car over, speaking with a person outside the car, and says, hey, did you just feel rain? It might have been rain. All of a sudden, is that somehow a prolonged detention or a legal detention? Is Rodriguez really a zero tolerance sort of doctrine so that even just an innocuous question and maybe just almost a what's the name of your cousin, I mean, could be viewed at one level as investigatory. At another level, it could be viewed as just maybe just an innocuous question. Oh, what's your cousin's name? There's two ways to view it. But Rodriguez isn't a zero tolerance case, is it? I think it refocuses the inquiry in terms of looking to reasonableness on whether a step was reasonably addressed to the traffic violation. So in the example, did I just feel rain? Which I would say is very different from the questions here. I think that could be defended as incident to the traffic stop's mission and that an officer might need to develop a little bit of rapport with a driver to enlist his cooperation in processing the speeding violation or whatever the traffic violation is. And there might be some room for small talk. The question would be, was that reasonably geared toward addressing the traffic violation? That's not the case here. And the question, what is your cousin's name, was not conversational. You can see on the video and you can tell from the trooper's subsequent testimony that it was an interview or an interrogation, an effort to drum up contradictions in the stories. Thank you, Your Honor. Thank you. May it please the court. Counsel. My name is John Yannink. I represent the passenger, Tykee Gardner, and I'd like to reserve two minutes for rebuttal. At the end of my argument. First, I just want to touch upon a couple of things and then I'm going to go into the trial issues related to Mr. Gardner. This is a very dangerous area where this trooper chose to stop this car. You can see it when you look at the video. It's a downhill grade. It has to do with the legitimacy of the Fourth Amendment search. Well, it has to do with the... He could stop him on an overpass. I mean, obviously, we would hope troopers would stop people in a safe place, but that doesn't shed any light on the legitimacy of the Fourth Amendment search. It does, Your Honor, because... Are you suing him for a tort of dangerous traffic stop? No, Your Honor. It goes to the characteristic of a traffic stop for a speeding ticket. If you... Going 20 miles over the speed limit, right? You'd want to get it done, is what I'm saying, in this area. But I'm talking about the length of the stop, not the location of the stop. The location in the area of the stop would want you, if you were going to just address a traffic violation, to do it in a rapid manner and get it done, not to try to prolong it as we've done in this case. Well, I mean, maybe that's the case until you see four air fresheners in the car. And maybe if it were just a traffic stop, you'd say, okay, we just want to get this done, we'll get it done. The officer walks up and says, I just saw four air fresheners. This may be unfortunate. We're in a very busy place, but now I'm building reasonable articulable suspicion, potentially. He's definitely building something because he pulls my guy out of the passenger seat. He doesn't ask him anything about the traffic, the car, the speeding, or whatever. He goes into a whole other area of inquiry around it. But subsequently developed facts would explain away why this was stopped there and extended, not just the desire to stop someone at an inopportune place. All I'm trying to say is that if you're looking for a reasonable time for a traffic stop for a ticket, if that's supposed to be five to ten minutes, under these circumstances, if you were just going to do that, it would be the low end of the scale. This is way longer than a normal traffic stop. I think even Mr. Ford would agree with that. That's why we've got to determine whether there was reasonable articulable suspicion at some point, because if there wasn't early on, then it's an illegal search. I want to get to the trial issues. My client does go to trial. Mr. Fruit enters a plea agreement where he's allowed to preserve the issue of the suppression. Essentially, one of the main issues in my client's trial, because he's a passenger in this vehicle, he has no connection with the renting of the vehicle. He never drove the vehicle. There's no evidence that he had a connection with Mr. Fruit at any other time, other than taking this specific trip. The government puts forth forensic evidence for fingerprint examiner. It's exculpatory toward my client. There's no evidence that he has any connection with the drugs that are found in the trunk of the car. If you looked at the video, you see they're secreted deep in the trunk. They're under chairs, under a grill, way underneath the back of the trunk. What the government does is- What's the crime of conviction? A 2007 New York City- No, no, what's the crime of conviction in this case? Possession with intent to distribute and conspiracy, and the conspiracy count. Right, so it's a conspiracy count. So under Caraballo-Rodriguez, I mean, it's a pretty high mountain you need to climb under our en banc decision in Caraballo-Rodriguez in a conspiracy case, right? Well, I believe, Your Honor, in this case, if you look at how dissimilar the 2000 conviction is to the activity that is being alleged- You're arguing the 404B issue now? Yes. Okay, I was pushing back on you on the sufficiency issue. That in a conspiracy case, clearly, under Caraballo-Rodriguez, the evidence seems more than sufficient here. But you want to focus on 404B? Yes, I do. That's my first issue. This 2007 conviction is a New York City conviction for street trafficking. It has nothing to do with this kind of activity that's being prosecuted in this federal court. We're talking about a situation where we're 170 miles away from New York City, where there's drugs secreted in the trunk of this vehicle. The judge says in his opinion that the conviction is highly prejudicial. So if it's highly prejudicial, it has to be somehow super probative to overcome that balancing test. And where does it go? The prosecution tries to say that it's knowledge and intent. Well, knowledge of what? Knowledge that- I mean, the drugs weren't found in the backseat of the car. It's not knowledge of like, ooh, I should know what's in the backseat of the car there, sitting there. That's contraband. That's cocaine. No. The drugs are found deep inside the back trunk area. It's not in the passenger compartment at all. But this whole argument, Mr. Yaninik, seems to be a critique of our opinion in the United States versus Givon from 2003, correct? I don't like Givon, but you're right. I mean, your brief- I'm looking specifically at page 20 of your brief. Your brief says the Third Circuit does not appear to align with the approaches taken by the other circuits, as laid out below, as evidenced particularly by United States v. Givon. So- but this panel is powerless to change Givon. No, you have to look at the circumstances of this case, because we're getting farther and farther afield of Givon. Givon, in this case, we're talking about a decade-old conviction. You know, what does this court have to put some limits on this? So if you're convicted of a drug trafficking offense, it's going to be admissible for life. Is that what the court wants? I think there has to be some amount of balancing that has to come into this- Right, but doesn't the balancing have to be done by the district judge? I mean, shouldn't we trust our district judges to do that balancing? It's a total abuse of discretion when you look at how he wrote the opinion. He's telling you that this is highly prejudicial. So where does he show in that opinion that this is highly probative? It's not. You cannot make an articulable argument, Your Honors, that it's highly probative of anything other than propensity. And that's not the way it should be. So this was not offered for non-propensity purposes? Well, under the guise it was. It's offered for knowledge and intent. Within 40 minutes of the trial, it's brought in. The judge gives an instruction, wakes all the jurors up. Hey, he was convicted in 2007 of trafficking drugs in New York City. So the game was over right then and there. Couldn't recover from that. Could not. I mean, that's sort of an inherent problem with this type of evidence, right? Because it can influence a jury in both ways, right? It could be focused upon for knowledge, but it could also tell jurors, oh, this is a bad guy. It fixes a weak case, too. Pardon? It fixes a weak case, too. I'd ask you. I'll be back after. Okay. All right. Thank you, Mr. Romero. Mr. Ford? Thank you, Your Honor. May it please the court, my name is Scott Ford, and I represent the United States in this matter. I intend to begin by addressing the traffic stop, as it's the matter that affects both defendants. And, Your Honor, to answer your question to Mr. Donahoe, the Rodriguez moment in this case was when Trooper Ramirez called for backup. Because he intended to ask for consent to search the vehicle. By the point that he did that. Do you know what time in the video that was? Your Honor, I have it at a few minutes before 35 minutes and 40 seconds. The Trooper turns the audio off at 12 minutes. So 35 minutes into the traffic stop? Correct, Your Honor. That can't be right. Why is that the moment? Your Honor, that's the moment because everything that he did prior to that was related to the traffic stop. Oh, including, do you have any drugs in the car? No. Cocaine? No. Heroin? No. He listed about 15 different drugs. What does that have to do with a speeding ticket? Your Honor, the Rodriguez says that a Trooper has the ability to do things that aren't directly related to the traffic stop. Including fishing for other crimes, like drug trafficking? Yeah, you can't investigate ordinary crimes. That's verbatim from Rodriguez. Yes, Your Honor. But you're saying you can investigate extraordinary crimes. No, Your Honor. Is that your position? No, Your Honor. What Rodriguez says is that the Trooper isn't restricted to strictly asking the defendant about speeding. He's also allowed to check into warrants and to determine if the vehicle's operating correctly, whether there's any safety issues regarding the vehicle. He's also allowed to take steps to ensure his own safety. But doesn't that mean that after the Trooper pulls the gentleman over for speeding, it's license registration, get that information, go back to your squad car, run the plates, run the license, any outstanding warrants, go back and issue the ticket. Isn't that what that means? It doesn't mean engage in dozens of questions. You know, where are you going? What cousin? What's the name? Any drugs in the car? On and on and on. That seems to be the exact opposite of what Rodriguez is telling us to do. Your Honor, this Court has a long history of cases stating that asking the driver their travel plans is not an issue. And it's part of that. Cases decided before Rodriguez. Correct, Your Honor. Well, we're really fixated on Rodriguez because we try hard to do what the Supreme Court tells us to do. Understood, Your Honor. But this Court also, although it didn't directly address it, in Green, which was decided after Rodriguez, in that case, under the facts of the case, the Trooper did ask the driver about travel plans. But let's just tease this out. I mean, the list is pretty short. It's license, registration, maybe proof of insurance along the way. Run the tags, maybe see what else happens. And maybe if Green is with you post-Rodriguez, you could say destination and origin. So that's a handful of questions. Without reasonable, articulable suspicion, isn't Rodriguez pretty clear that that's it? And then you say that those five questions, something happened for the next half hour, thereby that it was still permitted under Rodriguez? It seems it's about five questions. Maybe a handful, maybe I'm missing one or two. You don't get too much else unless you have reasonable, articulable suspicion. So shouldn't your real point be that there was some other reason that took this out of ordinary criminal activity investigation? And went into reasonable, articulable suspicion of a specific crime? And then you get more flexibility even post-Rodriguez? As opposed to try to push the Rodriguez moment out past a handful of questions? Your Honor, I believe that there's several reasons why that conversation the Trooper Ramirez had with Defendant Fruit was still on point with regard to, I should say, didn't violate Rodriguez. Okay, so let me just think of one question. I believe this stop occurred on July 5th. So I think at one point in time the officer asked, are you working today? Why aren't you working today? I'm paraphrasing, something along those lines. But asked if he was off work. What does that have to do with this traffic stop? Because that's before the Rodriguez moment that you identified. Your Honor, I think if you look at that conversation, it's a carry-on. And I apologize, Your Honor. I believe it's a carry-over as part of the travel. But the point is Rodriguez doesn't allow too much carry-over. There was a time when carry-over was kind of permitted as long as it wasn't prolonged. That time is gone. Understood, Your Honor. But that conversation, what happens is at about three minutes into the traffic stop, the Trooper Ramirez asks the defendant to step out of the vehicle. They have a quick conversation. And he says that the defendant states that the vehicle is a rental car. He asks him to get the rental car contract. The defendant comes back, hands Trooper Ramirez the rental car contract. Trooper Ramirez asks, where are you heading? How long are you going for? What's the purpose of your trip? And it's whenever he says, I'm coming back in two days, Trooper Ramirez says, oh, okay, are you working? Yeah, I'm working. Oh, what are you doing? I'm working in construction. So what does that have to do with a speeding stop? Your Honor, it's all part of a... Is employment an element of speeding? Is employment activity or non-employment activity an element of speeding? He asked him whether he was taking days off to make this trip. How does that relate to the purpose of the traffic stop? Your Honor, I believe just as you mentioned before Mr. Donahoe, Your Honor, it would be no different than, did you just feel rain? How are you doing today? Questions along those lines. So what do you do for a living? Is just part of small talk during a traffic stop? I believe, Your Honor, that this is just all part and parcel of his questions about where are you heading, what's going on. But the point is this, that might have been the law. Yes, Your Honor. That just doesn't seem like, I mean, as I read Rodriguez, that part and parcel kind of just we can talk, we can talk as long as we don't talk too long. That's not the law anymore as I see it. It has to be on mission unless you have a reasonable articulable suspicion. And so let me ask, let me ask this question. Is it your position that a car without estate plates, without barcodes, with four air fresheners, two passengers, that's a rental, does that suffice for reasonable articulable suspicion to inquire into drug trafficking? Under these circumstances I believe it does, Your Honor. And additionally at that point Trooper Rodriguez also stated that he knew the vehicle was going from New York to Hagerstown and there was nothing in the vehicle. There was no luggage. Nothing visible in the vehicle. There could have been luggage in the trunk. There could have been, Your Honor, but I believe he realized that the vehicle had been out for several weeks and whenever he looked in the vehicle he didn't see any luggage, he didn't see anything indicative that it was being regularly used. The only thing that he saw that jumped out at him was four air fresheners. Additionally, and although this might seem like a minor point, I do believe it ties into everything else, Trooper Ramirez stated that whenever he first identified the vehicle he pulled up alongside it and he looked over. Trooper Ramirez also testified he was driving an unmarked vehicle, but he was in full uniform. Whenever he did that and he looked over to see if the driver was wearing a safety belt, that's whenever Defendant Fruit looked over, saw him, would have identified him as a police officer and immediately leaned back behind the pillar to almost kind of obscure his view. So what does that have to do with the speeding stop? Your Honor, I believe it ties into reasonable suspicion. I believe it's one of the other elements. So he knows he's speeding, but before stopping him for speeding he pulls up alongside and does a visual, then backs up and says, now I'm going to pull over for speeding. Yes, Your Honor. Is that common practice to pull up? You see a speeding vehicle and then you say, you know, I want to do a visual on the driver before apparently I make a decision to stop this car for speeding. It seems that if you want to stop the car for speeding, you've got probable cause at that point in time to stop the car for speeding. You can get the visual when the car's pulled over. Yes, Your Honor. What is the point of pulling up alongside a car once an officer already has probable cause? Is there some law enforcement safety reason for that? No, Your Honor. Trooper Ramirez testified that he was checking to see if the driver and passenger were wearing safety belts. Couldn't he do that as soon as the vehicle stopped? Why didn't he do that right then and there? It would be very easy for the driver to just put a safety belt on at that point, Your Honor. And I can't say that Trooper Ramirez testified that he did that in all of his cases, but it didn't seem like an odd practice whenever he was stopping a vehicle for speeding. So the information that he gained from this safety belt check contributed to his reasonable suspicion later is what you're telling me? The fact that the driver leaned back once he identified that it was a trooper. Did he need 35 minutes to develop his reasonable articulable suspicion? No, Your Honor. Again, I believe that he had reasonable suspicion early on in the traffic stop. Can you identify when and what facts? It was those facts that we just mentioned, Your Honor. First, there was the fact that he leaned back. Second, the fact that the vehicle was going from New York to Hagerstown, Maryland, with absolutely nothing in the front of the vehicle with the exception of air fresheners. It was a rental car with the barcode stickers expired. The contract had been expired in mid-July, and it was due back the next day. You mean mid-June? Yes, Your Honor. I apologize. It was mid-June. And about when did he know those facts? Your Honor, he knew those before he asked that final series of questions to Defendant Fruit. Any contraband in the vehicle, any guns, anything along those lines. So he knew all of that information at that point. Excuse me. Additionally, what he testified to at the suppression hearing and what the district court found was that there was a reason that it took from 12 minutes to 35 minutes for Trooper Ramirez to finish all of the checks that he needed to finish. First, these defendants had out-of-state licenses, so he couldn't just swipe those in his reader. He had to manually input the information. Additionally, whenever the information came back, they had extensive criminal histories. Trooper Ramirez testified that he was 5'9", 160 pounds. These two gentlemen were much larger than him. He wanted to check over that criminal history, especially since there was an issue with firearms in the past. Additionally, he had to call Enterprise Rent-A-Car and check on the rental car contract. So all of those checks took time. Additionally, he called the Pennsylvania Criminal Information Center at the state police, and they ran a check to find out that these two individuals were also involved in HIDTA cases. So as a result, all of that built into the ultimate reasonable suspicion, but all of those were checks that he would have had to take, even if he never asked for consent to search the vehicle, it would have taken him 30 minutes just to get through all of those. And I have approximately eight minutes left, so with the court's indulgence, I'll move on to the issue of 404B. Your Honor, in this case, the district court admitted Mr. Gardner's prior conviction for drug distribution for two non-propensity reasons. First, his knowledge that cocaine was in the vehicle, and second, intent to distribute the drugs. Did he argue he didn't know cocaine was in the vehicle? He did not argue that, Your Honor, but the parameters of Rule 404B are not set by the defense theory of the case. They're set by the material facts the government has to prove, and that's from U.S. v. Sampson, and that's been cited several times since 1992 by this case to include U.S. v. Lee, as well as U.S. v. Major. So they're material facts that I had to prove at trial, Your Honor. So whether the defendant contested them or not, I still had to put on information. Now, first, with regard to knowledge cocaine was in the vehicle, it's important for two reasons. First, the fact that he previously had distributed cocaine indicates that he knew how to package cocaine. He knew how to obtain cocaine. He knew the pricing of cocaine. He knew the general qualities of cocaine, what it looked like, what it smelled like, things along those lines. Therefore, it would make sense that he would know how to identify it. But probably more importantly, in the specific facts of this case, goes to his statements to the trooper regarding his prior drug history. When Trooper Ramirez pulls him out of the vehicle and asks if he'd ever been arrested, he said, yeah, mainly for fighting. But he never stated anything about, I'd previously been convicted for distribution of cocaine. Additionally, in what the government initially tried to put in and the district court denied, we also tried to put in that he'd been convicted of possession of cocaine. And they also had charges pending for marijuana distribution in Hagerstown, Maryland. But all of that, the defendant did not tell Trooper Ramirez. So can I just tease this out? I mean, is there any limiting principle with this knowledge exception to 404B? Once an individual is convicted of any drug crime for a specific drug, it could be cocaine, it could be meth, you name it. It seems that then, under your theory, there's no limiting principle. Any subsequent trial of that individual for a drug of which they were previously convicted, under your theory, just bright-line blanket rule is admissible under 404B, no problem. Because it's necessary to show the knowledge element. So there's no limiting principle. We have a bright-line test. If you have a prior conviction for a drug, it can come in at a subsequent trial of that same drug to show knowledge. Done. Your Honor, I believe this Court set several limits on that. First one being that it has stated that possession of a drug, and that was in U.S. v. Davis, that does not, that cannot be admitted. Additionally, it's... But the prior conviction of distribution is what I'm talking about, of a specific drug, can always... It seems like, under your theory, that can always come in in a second trial because that would be needed to show knowledge. Your Honor, I would say... Under your theory. Although Caldwell dealt with a firearm, I believe what Caldwell came... Under Caldwell, if actual possession was at issue and not constructive possession, I believe that it would not be able to come in. So even in... But the point is this. We have a constructive possession case, and there's no limiting principle in constructive possession cases, is what I'm hearing. No, your Honor. I believe that second step in Huddleston, the step that requires the government to put it into a logical chain of inferences, I believe that's the limiting factor. And I believe, in this case, I believe the facts are very much in the government's favor. What about Mr. Yaninick's argument that the District Court acknowledged that it was prejudicial to Mr. Garner? It did, your Honor, but it also stated that... And show us where the balancing occurred, where the probative benefit was sufficient that it wasn't outweighed by any inherent danger of unfair prejudice. Your Honor, I believe it's from page 10 to 11 of the District Court's opinion. And I apologize, dealing with two different appendices, I didn't write down specifically what page in the appendix. But between pages 10 to 11 of the District Court's opinion, it conducts the 403 balancing test. And there it says, however, proving after stating that, yes, it's prejudicial, it states proving knowledge and intent is critical in this matter. Where circumstantial evidence is necessary to prove crucial elements of the crime, as it is here, corroborating evidence becomes even more important. It sounds a lot like Judge Phipps' automatic rule, right? That he was asking you, is this automatic? That all prior distribution convictions are coming in. No, your Honor, I believe that limiting piece comes in in that second step, where you have to fit it into a logical chain of inferences. Did the District Court tell us what that logical chain of inferences was? It did, your Honor, and in the second step, and that was obviously prior to the third step. First, he looks at the case with regard to defendant Fruit. Again, defendant Fruit was still in the case at that point. He says that we can infer intent to distribute when someone with knowledge of packaging and distribution techniques is found to be in possession of materials necessary for packaging and distribution. Again, in this case, there wasn't just the drugs, there were also gloves, there were also small bags, items that were there for packaging. We agree that such an inference is reasonable and has been reasonable before in the Third Circuit, and there it cites to U.S. v. Lee. Not just the drugs, it's the drugs, the gloves, and the small bags. When you have drugs, gloves, and small bags, that to you satisfies Huddleston Step 2. That's the limiting principle in instances where you wouldn't have the gloves and the small bags, and maybe this isn't automatic. Correct, Your Honor, or in instances where it's already packaged for resale, where you might have several bundles already in the defendant's pocket rather than a brick, such as you have here. And then, again, Your Honor, with Garner, he also talks about the prior conviction being showing knowledge. Finally, Your Honor, I would like to just briefly address the sufficiency of the evidence argument. You have a defendant in a rental car traveling from New York to Maryland with over $20,000 worth of narcotics in the trunk. The barcodes were removed, the air fresheners were clipped to each vent, there's absence of luggage anywhere in the vehicle. You have contradictory statements between Mr. Fruit and Mr. Garner regarding where they're going, who they're going to see, how long they're going, and most importantly, this defendant specifically lied. And we know that he specifically lied not just about his prior criminal history, but additionally, the government brought a witness in from the state of New York who testified that the defendant did not have a child custody hearing at any point in New York. The defendant had told Trooper Ramirez during that stop, I have to be back to New York for a child custody hearing. Okay, thank you, Mr. Ford. We'll hear rebuttals from Mr. Donohue first. Thank you, Your Honor. I think Mr. Ford offered the court just one fact that Your Honors had not identified known to the trooper as of what we've said is the Rodriguez moment. And that was that my client leaned back slightly when the trooper pulled alongside before pulling over the car. The trooper's never claimed it was an extraordinarily suspicious gesture, and surely it's, first of all, ambiguous whether he's even trying to hide himself at all. But moreover, being somewhat apprehensive about citing the police is an ordinary reaction, as this court and many other courts have noted, even more so if you think you're about to get a speeding ticket. The rental barcode stickers, again, I mentioned earlier that the trooper disclaimed that that was reasonable suspicion at page 193 of our appendix. An Enterprise Rent-A-Car representative, who the defense actually called, explained these go missing all the time, so you can't really assume if a car is missing it, that means the present occupant removed it. And what that leaves is air fresheners, and that's just, it's too innocuous. This court has said, quoting the Supreme Court, that the facts cannot take in too large a presumably innocent category of passengers to create reasonable suspicion. Well, clearly the air fresheners alone isn't going to cut it. Well, I certainly agree. But you seem to be doing the slice and dice method here. You want us to look at everything individually and say these things individually don't equal reasonable articulable suspicion, but we can't do that. We've got to look at the totality, right? Yes. But in the totality, you're saying that some of these other items don't, are, if anything, grains of sand on the balance. You're saying leaning back is, at most, a grain of sand on the balance for totality. You're saying that removal of barcodes is, at most, a grain of sand on the balance. And so what gives the weight to the balance, if it weighs enough, I don't know, reasonable articulable suspicion, is the presence of not one but four air fresheners in a rental car. And the question is, is that reasonable articulable suspicion with all the other facts or not? That's the inquiry, right? If it is, then subsequent lines of questions are permitted because they're Terry permitted. If not, then you've got Rodriguez to contend with. And maybe that moment isn't as late as your opposing counsel says. Yeah, I mean, I think the way your honor just put it, that these are grains of sand on the balance is well put. So I do believe the court has to resolve whether there was reasonable articulable suspicion. And it must conclude there was not. Even Trooper Ramirez never testified outright that he thought he had reasonable suspicion as of seven and a half minutes into the stop. He testified he thought he had reasonable suspicion when my colleague said 37 minutes or 35 minutes into the stop. So this court shouldn't be the first to conclude that air fresheners, along with these truly innocuous facts, create a reasonable articulable suspicion. And the court's decision in ten thousand seven hundred dollars in U.S. currency actually mentioned air freshener says they're of negligible probative value. So we thank your honors. Thank you, Mr. Miller. Mr. Yaninik. Your honors, I challenge you to look at what the district court knew about the 2007 New York City drug conviction. That's it's in the it's in the motion eliminated that the prosecution filed. And I submit to you it's it's very limited. It's very limited information other than just the fact that the guy was convicted in New York City. So you don't get the benefit of trying to expound on that to say, well, you knew about how to package, you know, cook powder into crack. He knew how the baggies go. He knew he knew how to use the gloves. You know, all these things. That's what Mr. Ford's trying to tell you, that this conviction meant. But where do you get that knowledge? It certainly isn't in the one line that that he was convicted that was submitted within the motion eliminate. So how do you get to jump to those conclusions? Can't you? You could go the other way, too, and say, well, hey, someone gave him this. These packages of rocks to go on the corner and swap them out and hand in sales. He may not know anything about how to package all these drugs in different ways and manners and make money or where they come from. Isn't that why the Huddleston step to analysis in this specific case matters? Because it wasn't just drugs. It was drugs, gloves and small bags. That's what was found in the trunk of the car. But how does my client have knowledge of that as a passenger? There's no evidence. There was no evidence that he was ever in the trunk, that he ever had any knowledge that that was back there. Yeah, there's a certain it's a certain sort of compartment. It's a circumstantial case. Solely solely. And then when you add this conviction to it, it's over. So you got to look at it. And if the judge himself, in his opinion, is saying it's highly prejudicial and it is highly prejudicial. What's highly probative? What's highly probative that gets you through knowledge and intent? And it's not there. And I ask you to send it back. Let's do it again. Thank you. Thank you, Mr. Unenick. Thanks to all counsel. Very helpful argument. We'll take the matter under advisement.